Mamie CURRIE

v.

UNITED STATES of America.

Magnolia WILLIAMS

v.

UNITED STATES of America.

Irene T. TAYLOR

v.

UNITED STATES of America.

Civ. Nos. 12856–12858.

United States District Court
D. Maryland.

Jan. 5, 1962.

Harry K. Lott and Eugene A. Alexander, III, Baltimore, Md., for plaintiffs.

Carl J. Lorenz, Jr., Asst. U. S. Atty., and Joseph D. Tydings, U. S. Atty., Baltimore, Md., for defendant.

WINTER, District Judge.

The plaintiffs, three of seven passengers returning from their place of employment at Henryton State Hospital, Sykesville, Maryland, on January 4, 1961, each sued the United States under the provisions of 28 U.S.C.A. § 1346(b), for injuries, including alleged partial permanent disability, sustained when the 1960 Ford station wagon in which they were riding was struck in the rear while stopped on U. S. Route 40 by a 198 Plymouth sedan, operated by John P. O'Hara, a special agent employed by the Federal Bureau of Investigation. Since each of the plaintiffs' claims arose out of the same accident, a motion at the trial to consolidate the actions for purposes of trial was granted. The parties have waived the filing of formal findings of fact and conclusions of law.

The accident occurred when the 1960 Ford station wagon was, at approximately 4:00 o'clock P.M., stopped in the eastbound lane of U. S. Route 40 at a point immediately past its intersection with Maryland Route 29, behind a school bus, in compliance with the mandate of Article 66½, Section 259, of the Annotated Code of Maryland, which requires all vehicular traffic to come to a complete stop at least 10 feet behind any school bus stopped to receive or discharge school children. The station wagon was struck from behind, principally on the right side, by the 1958 Plymouth sedan operated by Special Agent O'Hara, whose brakes failed to operate.

Immediately after the accident, the O'Hara vehicle was towed to a nearby service station and the foot brakes tested and found to be inoperative.

Mr. O'Hara testified that on the date of the accident he had been driving the Plymouth since approximately 11:00 A.M. His assignment for that day had taken him to South Baltimore, then to Southwest Baltimore, and then to Mt. Airy, Maryland. In the course of these travels, he had used his brakes numerous times and had stopped frequently and the "brakes operated perfectly satisfactorily." While returning from Mt. Airy, Maryland, Mr. O'Hara had travelled approximately 20 miles when the accident occurred. Immediately prior to the accident, at a distance estimated at a mile to a mile and a half before the scene of the accident, he had had occasion to employ his brakes and they had functioned properly. At that time the brakes did not "fade" and there was no brake failure or grabbing of the brakes, nor was it necessary to pump the brakes at any time.

After the impact, Mr. O'Hara managed to stop his vehicle by employing the hand brake, but he made no such effort prior to the instant of collision, because, he explained, he was too close to the station wagon to stop, and his experience with 1958 Plymouths indicated that the hand brake would not stop his vehicle.

28 U.S.C.A. § 1346(b) gives the District Courts of the United States jurisdiction to hear and determine claims against the United States for money damages for injury " * * * caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Since there is no issue that Mr. O'Hara

was not properly acting within the scope of his employment, the first legal question presented is whether, under the Maryland law, the Government is liable to the plaintiffs and, if that question be answered in the affirmative, the questions then arise as to the proper measure of recovery for each plaintiff.

Article 66½, Sections 291(a) and 292 (a) and (b), Annotated Code of Maryland, require every motor vehicle, while in use on the highways of the State, to be provided with two separate means of applying brakes to at least two wheels under the circumstances set forth in the statute. The "service brakes" must be capable of bringing the vehicle to a stop within 30 feet when the vehicle is operated at a speed of 20 miles per hour, and the "hand brakes" must be capable of bringing the vehicle to a stop within 55 feet under like conditions.[1]

The principal case is Sothoron v. West, 180 Md. 539, 26 A.2d 16 (1942), in which the plaintiff sought recovery from the driver of a lent vehicle for damages resulting from a rear end collision shown to have been caused by a brake failure. In holding that there should be recovery, the Maryland Court of Appeals stated (p. 543, 26 A.2d p. 17): "In some states having similar statutes, [i. e., statutes requiring adequate foot brakes] it has been held that driving with defective brakes is negligence *per se.* * * * The better and more general rule, however, seems to be that failure of brakes to operate makes only a *prima facie* case which the driver may defend by showing proper inspection and a sudden failure without warning. * * *" In the Sothoron case, the driver was held liable since the evidence disclosed that before and while driving the lent vehicle, she made no effort to determine the efficacy of the brakes.

Perhaps more in point is Kaplan v. Stein, 198 Md. 414, 84 A.2d 81 (1951), where the appeal was from a judgment obtained by the owner of property damaged as a result of a brake failure on the part of a vehicle owned by the appellants and operated by their bailee. In this case, the Court of Appeals, by analogy to the defective door case of Milestone System v. Gasior, 160 Md. 131, 152 A. 810 (1931), and reliance upon the Restatement of the Law of Torts and several out-of-state authorities, affirmed the judgment and approved the rule that (p. 420, 84 A.2d p. 84): "'* * * while an automobile is being properly used for the purpose for which it was hired, a defect in the automobile works an injury, it then becomes incumbent on the letter to show that the defect was preventable by any care or skill on his part. This is particularly true where the defect would have been ascertained by a skillful and careful inspection, and the defendant and not the plaintiff were in possession of the automobile until the letting.' * * * There seems to be no difference whether the loan is for hire or whether it is gratuitous."

1. Art. 66½, Sec. 291

"(a) Two brakes.—Every motor vehicle, other than a motorcycle, when operated upon a highway shall be equipped with brakes adequate to control the movement of and to stop and hold such vehicle, including two separate means of applying the brakes to at least two wheels. If these two separate means of applying the brakes are connected in any way, they shall be so constructed that failure of any one part of the operating mechanism shall not leave the motor vehicle without brakes on at least two wheels."

Sec. 292

"(a) Adequacy of service brake.—The service brakes upon any motor vehicle or combination of vehicles shall be adequate to stop such vehicle or vehicles when traveling twenty (20) miles per hour within a distance of thirty (30) feet when upon dry asphalt or concrete pavement surface free from loose material where the grade does not exceed one (1%) per cent.

"(b) Adequacy of hand brakes.—Under the above conditions the hand brake shall be adequate to stop such vehicle or vehicles within a distance of fifty-five (55) feet and said hand brake shall be adequate to hold such vehicle or vehicles stationary on any grade upon which operated."

Other Maryland cases having general application are Brehm v. Lorenz, 206 Md. 500, 112 A.2d 475 (1955), which establishes that in rear end collision cases between motor vehicles there is a duty upon the operator of the rear car to exercise ordinary care to avoid colliding with the front car and, further, that the mere happening of a rear end collision is not proof of negligence of either driver; and Lehmann v. Johnson, 218 Md. 343, 146 A.2d 886 (1958), which holds that even in emergency situations the driver of a motor vehicle must use ordinary care, because the mere fact that he finds himself in a predicament where an emergency does not automatically relieve him of that obligation.[2] Of course, the general statement in the Brehm case, supra, that the *res ipsa* doctrine does not apply to rear end collision cases, is modified by the rule of the Sothoron and Kaplan cases, supra, (referred to as late as Hickory Transfer Co. v. Nezbed case, 202 Md. 253, 96 A.2d 241 (1953)), where, as in the case at bar, the owner or operator of the vehicle causing the rear end collision defends upon the ground of defective brakes, thus in effect, pleading confession and avoidance.

In accordance with the Maryland rules, it thus appears that, *prima facie* but not *per se*, plaintiffs have shown negligence and the burden of showing proper inspection and a sudden failure without warning rests upon the Government. There can be no dispute but that there was a sudden failure without warning, because the testimony of Special Agent O'Hara to this effect is uncontradicted. To show proper inspection, the following facts were established:

There is in existence a complete file with regard to each vehicle maintained for the use of employees of the Federal Bureau of Investigation in the Baltimore Office showing repair work performed on the vehicle, forms used by mechanics who work on the vehicle and inspection forms. These automobiles are operated on a pool system, so that a special agent does not necessarily have access to the same vehicle on each occasion that he requires transportation.

Each time that a vehicle is used by an employee a continuing requisition slip must be signed, and there is a space provided on this signout card to indicate the need for any repairs which may be apparent to the user. An employee using a vehicle may also execute a direct repair order and, further, may place a red card with the registration and identification papers applicable to the vehicle to flag its recommended non-use until its repair.

Monthly inspections are made of each vehicle and the inspections are required to be made in considerable detail, including five items applicable to the hand and service brakes, such as a determination that the hand brake will bring the vehicle to a stop within a reasonable distance when operated at a speed of 10 miles per hour, and that there be approximately one-third reserve pedal play in the service brake after the service brake has been employed to stop the vehicle several times. In addition to the monthly inspection of each vehicle, there are yearly spot inspections of vehicles made by representatives of the Washington Office of the Federal Bureau of Investigation to determine the adequacy and efficiency of the monthly inspections. The spot check is made of approximately 25% of the cars available for use by employees of the F.B.I., but whether the spot check included an inspection of the 1958 Plymouth automobile involved in this accident is undetermined.

---

**2.** Plaintiffs argue, in addition to the argument that the failure of the foot brakes constituted negligence on the part of the Government, that Mr. O'Hara's failure to apply the hand brake was negligence on his part attributable to the Government because he was acting within the scope of his authority; and if in fact his hand brake would not have achieved the desired result, that, too, was negligence on the part of the Government. In view of the conclusions hereafter reached, these additional contentions need not be answered.

The various monthy inspection forms, repair orders and signout cards for the 1958 Plymouth were produced in the case and admitted in evidence. The monthly inspection for September, 1960 was made September 22, 1960 and it indicated that the hand and service brakes were in proper working order, as did the inspection report dated October 12, 1960 and the inspection report dated November 30, 1961. Notwithstanding the testimony that these inspections were made monthly, no inspection was made during the month of December, 1960 and the first several days of 1961, prior to the date of the accident.

The repair orders cover a period from December 3, 1958 to August 30, 1960. To summarize the pertinent ones: on December 19, 1958 it was reported that the brake pedal needed adjustment, and the mechanic recorded that he had adjusted the brakes and checked the brake fluid. On December 22, 1959 there was a second report that the brakes needed adjustment, and it was recorded that the brakes were adjusted. On April 18, 1960 there was a report that the brake pedal was down to about one-third and the suggestion made that the brake lining be inspected. The mechanic noted that he had adjusted the brakes and checked the brake fluid. Again, on June 1, 1960, there was an order to check the brakes for improper operation, and the repairs recorded included the installation of inner and outer oil seals for the brake system and the installation of a set of new rear brake shoes. On June 8, 1960 the employee requesting repairs stated that the brakes needed adjusting badly, and the repairs recorded were that the brakes were checked, adjusted and bled.

Two days later, on June 10, 1960, the employee using the vehicle reported that "after applying and holding brakes, the pedal gradually decreases to the floor board" and, on this occasion, the master brake cylinder was replaced and the brakes bled. On August 30, 1960 it was reported that the brakes pulled to the right and there was a grinding noise in the right front wheel. The agent making the report suggested that the right front brake lining be checked. The mechanic reported that he removed the wheels, inspected the brake lining and corrected the pulling action so reported.

No repair orders of a later date were produced at the trial, but the signout card was offered and admitted. The cards showed that the vehicle had been used regularly within the period December 8, 1960 to January 4, 1961. On December 21, 1960 the agent who used the vehicle recorded on the signout card the notation "right front brake grabs." Apparently there was no investigation of this report, nor did any inspection or repair order follow it.

■ On these facts and the testimony of Special Agent O'Hara that he had had occasion to employ the brakes numerous times on the day of, but prior to, the accident, I conclude that there was no negligence on the part of Special Agent O'Hara, since, for himself, he had made a proper inspection and test, Sothoron v. West, supra; but, as I read the Sothoron case and Kaplan v. Stein, supra, I think it is incumbent on the Government, in order to sustain its defense, to show that the defect was not preventable by any care or skill on its part and, in order to meet this burden of proof, the Government must show that it made a skillful and careful inspection, and the defect was of such a nature that it would not have been disclosed.

■ The evidence to show what specific failure of the braking system caused this accident is not clear. The Government produced as a witness Mr. Alden Dyke, a mechanic who had been employed as such by the Federal Bureau of Investigation for ten years and had had general experience as a mechanic for twenty-two years. Mr. Dyke had taken a course in the repair of automobiles manufactured by the Chrysler Corporation, the manufacturer of the 1958 Plymouth involved in the accident, and the course included a study of the braking system.

Mr. Dyke examined the Plymouth the morning after the accident and his in-

spection included the removal of the wheels, inspection of the brake linings, brake shoes and brake housing. He disassembled the master brake cylinder and found therein a burr in the body of the master cylinder, specifically, in the return hole. Mr. Dyke expressed the opinion that the accident was caused because the master cylinder ceased to function, and that this defect could not be found except by disassembling the master brake cylinder. Mr. Dyke also testified that grabbing of one or more of the brakes might result from a leak in the wheel brake cylinder, as well as other reasons, such as grease or moisture on the brake lining of that wheel, and he admitted that the report made on December 21, 1960, of grabbing on the right front wheel brake might have indicated a leak and loss of brake fluid from that cylinder. In response to a question by the Court, Mr. Dyke stated that a gradual loss of brake fluid would not become apparent to a person operating the vehicle until there was a complete failure of operation of the foot brake. Mr. Dyke also expressed the opinion that all of the brake fluid in the hydraulic brake system could not have leaked out of the right front brake cylinder within the period from December 22, 1960 to January 4, 1961, the date of the accident.

In the light of this testimony, the Court is left in doubt as to whether the accident occurred as a result of a latent defect in the master brake cylinder not discoverable by ordinary inspection, or a defect in the right front wheel brake cylinder. If the latter, the notation of December 22, 1961 certainly constituted sufficient notice to the Government of a defect needing correction, particularly after the long history of brake difficulties before recited, and the failure of the Government to make an inspection and proper repairs after that notice would constitute negligence on its part, as distinguished from that on the part of the operator of the vehicle. Since the mind of the Court is in a state of equal balance as to exactly what happened, the legal conclusion must be reached that the Government has failed to meet the burden of proof imposed on it by the rules laid down in the Sothoron and Kaplan cases, supra, and, hence, there is liability on the part of the Government.

There remain to be decided the questions of damages to be awarded to each of the plaintiffs. The claims of the plaintiffs will be considered in the order in which suits were filed.

### —Mrs. Mamie Currie—

Mrs. Currie was a passenger on the front seat, beside the driver. After the accident she went home and received no medical treatment. She reported to work the next day and one of the staff doctors referred her to her family physician, Dr. I. Bradshaw Higgins.

As a result of the accident, Mrs. Currie sustained injuries to her neck, head and knees. X-rays were taken of her head and back and she returned to work on January 29, 1961.

As a State employee, Mrs. Currie suffered no actual loss of pay, but she was required to consume her sick leave, and for the period that she was unable to report for work she received as sick pay her regular compensation, in the amount of $270.40. Her bill from Dr. Higgins amounted to $140.00. She was also treated by Dr. Jesse N. Borden, an orthopedic specialist, who prescribed that she wear a specially designed girdle to give additional support to her lower back. She states that since the accident she cannot do much lifting, particularly of patients at the Henryton Hospital, where she is employed as a practical nurse, without wearing her girdle and that sometimes her head and back hurt, especially when the weather is cloudy.

Dr. Borden did not examine Mrs. Currie until May, 1961. He diagnosed her difficulty as a chronic low back sprain, and testified that she has a partial permanent disability of her lower back of approximately 10%. Dr. Borden stated that such a 10% disability does not keep people from working, although Mrs. Currie has shifted to night employment at Henryton State Hospital, where her du-

ties are somewhat lighter than her previous daytime employment.

At the instance of the Government, Mrs. Currie was also examined by Dr. Samuel E. Proctor, a general surgeon, who found, on March 20, 1961, that she sustained no limitation of motion, no muscle spasms or deformity of her back or extremities. Dr. Proctor was of the opinion that she had made a complete recovery as of that date, and that she would experience no further difficulty as a result of the accident.

The Government appears to concede Mrs. Currie's right to recover wages equivalent to the amount which she was paid while on sick leave,[3] and it seems clear that she should also recover her medical expenses. Under all of the facts, the Court will enter judgment for this plaintiff for the sum of $2,000.00.

—Mrs. Magnolia Williams—

■ Mrs. Williams was seated in the middle seat of the nine-passenger station wagon and the impact of the collision threw her forward over the front seat. After the accident she was taken home by another employee of Henryton State Hospital and she immediately sent for Dr. James M. Pair, who examined her. She was unable to report to work and, on January 6, 1961, she went to Dr. Pair's office. She was treated by Dr. Pair regularly and did not return to work until April 10, 1961. Mrs. Williams has two children, and from the date of the accident until her return to work it was necessary for her to increase the compensation paid to the person she employs to care for her children by $9.00 per week, so that person would take on the extra duties of washing, cooking and heavier housework.

Since the accident, Mrs. Williams says that she has had continual trouble with her back, that periodic pain she has experienced in the past has become more intense, that she cannot lift her infant son, and that lifting patients is more difficult. She, too, wears a back support and after she first returned to work she was required to lose additional time because her "back was bad." Since July 22, 1961 she has transferred to night duty at the hospital, where the work is easier.

Dr. Pair stated that Mrs. Williams has not been seen by him since April 7, 1961, but at that time he concluded that she would need a back support for an indefinite period, that, subjectively and objectively, she was not recovered, and that she had sustained a 25–35% permanent partial disability to her back. Dr. Pair's charges to Mrs. Williams amounted to $430.00.

3. The Government does not contest the allowance of compensation equivalent to the amount of sick pay received, although the point has not been decided by the Maryland Court of Appeals. John B. Brown, business manager of Henryton State Hospital, testified that State employees accumulate sick leave up to a maximum of 100 days, according to the length of employment. Plaintiffs claim the right to recovery on the theory that sick leave consumed as a result of the Government's negligence is not otherwise available to them for other illness, although no proof was offered to show Plaintiffs accumulated sick leave to the date of the accident or how much has been earned subsequent thereto. The closest Maryland cases appeared to be Plank v. Summers, 203 Md. 552, 102 A. 2d 262 (1954) and Baltimore Transit Co. v. Harroll, 217 Md. 169, 141 A.2d 912 (1958). In the latter it was held that (p. 175, 141 A.2d p. 915): "Where there is no specific provision in a compensation law making an employer an indemnitor with a right of subrogation, the courts have held that he has no * * * right as to compensation or expenses paid to, or for the benefit of, the injured employee, *and that the employee may recover both compensation from his employer and damages from a third person.*" (Emphasis supplied). Since the enactment of Sec. 105(d) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 105(d), sick leave compensation for all of the period except the first 7 days is excludable from "gross income" for purposes of the federal income tax laws, so that it be said that as to loss of wages, Plaintiffs emerge from the litigation more than whole.

Mrs. Williams was also examined by Dr. Jesse N. Borden, first, on March 16, 1961 and, again, on June 5 and July 3, 1961. He is of the opinion that she suffers a 10% permanent partial disability of the back, and he suggests, also, that one of her vertebrae may have been cracked as a result of the accident. Dr. Proctor examined Mrs. Williams on March 20, 1961 and found no limitation of motion, muscle spasm or deformity of the back or extremities. X-rays taken as part of the examination did show some slight straightening of the cervical curve which may be due to muscle spasm. Dr. Proctor was of the opinion that Mrs. Williams' prognosis was good, and that there was no permanent disability. Dr. Proctor did find some evidence of arthritis in the affected area and admitted that trauma may cause arthritis to flare up, but he could find no reason to believe that such was the case in regard to Mrs. Williams. Mrs. Williams is entitled to recover loss of pay,[4] in the amount of $1,197.17, medical expenses in the amount of $430.00, the amount expended for cost of domestic service, and for the injuries she sustained. The Court will enter judgment for Mrs. Williams in the amount of $4,000.00.

—Mrs. Irene Taylor—

Mrs. Taylor was seated on the rear seat of the station wagon, and she received a severe impact as a result of the collision. She was taken to the hospital and received first aid. She visited Dr. I. Bradford Higgins the next day. Both arms and legs were bruised and the back of her head, her neck and her back were injured. She still experiences considerable discomfort of her neck, especially at night. Mrs. Taylor was absent from employment for the same period as Mrs. Currie, and her bill from Dr. Higgins was $150.00.

Dr. Higgins last examined Mrs. Taylor in August, 1961. He stated that at the time of that examination he found a 10% permanent partial disability, and that there had been no demonstrable improvement between the date of the examination in August and his previous examination in March.

Dr. Proctor examined Mrs. Taylor on March 20, 1961, when she complained of low back pain, and the fact that her neck was stiff and sore at times. Dr. Proctor could find no limitation, muscle spasm or deformity of Mrs. Taylor's extremities or back, although she did complain of pain and tenderness in a portion of her back when she was moving her trunk. Dr. Proctor felt there was no objective test to support the patient's complaint of pain.

Mrs. Taylor is entitled to recover an amount equal to the compensation paid her on sick leave, i. e., $270.40,[5] the bill rendered her by Dr. Higgins, and for the injuries which she sustained. The Court will enter judgment for her in the amount of $2,000.00.